Chester J. BRODERICK
vs.
Joseph M. JORDAN, as he is Police
Commissioner of the City of Boston

C.A. No. 45463

Superior Court Department
Trial Court of the
Commonwealth of Massachusetts

December 2, 1980

Frank J. McGee for the plaintiff.
Johnathan D. Cunter for the defendant.

## MEMORANDUM OF DECISION AND ORDER ON THE MOTION OF THE PLAINTIFFS FOR A PRELIMINARY INJUNCTION

In this action for declaratory and equitable relief, the plaintiff Broderick, acting as Chairman of the Bargaining Committee of the Boston Police Patrolmen's Association, Inc. and as its representative, seeks a preliminary injunction to delay the imposition of a major reorganization of the Boston Police Department pending further labor negotiations. The Boston Police Superior Officers Federation, INC. ("Superior Officers") in an extraordinarily sparse three-paragraph complaint, apparently seeks the same relief although this is unclear from its inartfully phrased prayer for relief.

The facts, gleaned from the affidavits submitted and the representations of counsel,[1]

---

[1] It should be remembered that, in ruling upon this motion for a preliminary injunction, this court is not bound by the rules of evidence and can rely on such data as it deems probative to expeditiously resolve the question presented. See Proposed Massachusetts *Rule of Evidence 104(a).*

appear to a reasonable likelihood to be these:

For the past nine or ten months the Boston Police Commissioner and his command staff have been formulating a revised resource allocation patrol plan. Using computerized information on the nature, location and number of calls for police assistance, as well as information obtained from the communities involved, the Commissioner has determined to effect substantial changes in the deployment of officers under his command. To the extent here material, the reorganization plan establishes one hundred thirty-nine (139) new one-man walking beats. It is apparently along these beats that the greatest number of calls for police assistance have been received. Officers walking these new beats will be expected to respond to "priority three" calls, i.e., gang calls, family dispute calls, noisy house disturbances, landlord-tenant disputes, vehicular accidents, explosions and fires, investigation of fugitives, sick and lost persons, and the like.

Once developed, the reorganization plan has in no sense been kept secret. The City Council and various public interest groups have been advised of its provisions and, while the Boston Police Patrolmen's Association ("Patrolmen's Association") was never invited to bargain over its provisions, it was well aware of them prior to being formally advised thereof on October 16, 1980. Orders from the Commissioner implementing the reorganization plan were issued on October 22, 1980 and, on October 23, the Patrolmen's Association requested the Police Department to engage in bargaining over the plan. Even before making this request, the Patrolmen's Association, on October 17, 1980 filed a complaint of prohibited practice with the Massachusetts Labor Relations Commission alleging a unilateral change in the working conditions of its members which could not be implemented without bargaining. On October 27, 1980, the present plaintiff filed an action in this court seeking injunctive relief and, on that same day, another justice of this court enjoined the implementation of the reorganization plan "until such time as the Superior Court determines whether the proposed reorganization increases (to an extent not marginal) such risk of harm to the health and safety of members of the Boston Police Patrolmen's Association as is shown to be a probable result of the defendants' plan to reorganize the Boston Police Department." **Broderick v. Jordan,** Superior Court Civil No. 44913 (October 27, 1980). The Commissioner promptly appealed pursuant to G.L. c. 231, § 118. He also offered to bargain. The Patrolmen's Association accepted this offer and agreed that the injunction might be vacated. Accordingly, the justice of the Appeals Court vacated the injunction on October 31, 1980. **Broderick v. Jordan,** Appeals Court No. 80-0311-CV (October 31, 1980). Apparently, the parties also agreed to dismissing the original complaint.

Bargaining has followed. Both sides, thus far, appear dissatisfied with it. The City claims that the Patrolmen's Association is dragging its feet while the Association counters with a charge of failure to bargain in good faith, which charge has been declared to be unfounded by the Massachusetts Labor Relations Commission. Both sides, however, have come to agree that the present phase of negotiations has reached an impasse. For its part, the Patrolmen's Association invokes the jurisdiction of the Joint Labor-Management Committee pursuant to St. 1973, c. 1078, §4A. The Commissioner and the City, in turn, have promulgated new orders implementing the reorganization plan at 8:00 a.m., December 3, 1980. The present action was filed on November 28, 1980 and, thus far, has involved two separate hearings, each one extending for approximately two hours. The parties have also submitted extensive and helpful briefs.

### The Substantive Issues

In the labor-management context, the considerations which may lead a court to granting an injunction to preserve the status quo pending the outcome of labor negotiations are somewhat different than the variables required for injunctive relief under Mass.R.Civ.P. 65. See note, "Labor Injunctions, Boys' Markets, and the Presumption of Arbitrability," 85 Harv.L.Rev.

636, 642 (1972) (hereinafter "Harvard note"). "One of the major elements of national labor policy has been a strong preference for a peaceful settlement of industrial dispute through the process of arbitration. **Textile Workers Union v. Lincoln Mills**, 353 U.S. 448 (1957)." Harvard note at 636. Accordingly, in a series of cases which have come to be known as the **Steelworkers Trilogy**,[2] the Supreme Court has fashioned substantive labor law in a mold which permits injunctions to maintain the status quo pending the outcome of bargaining and arbitration. **Boys' Markets, Inc. v. Retail Clerks Local 770**, 398 U.S. 235, 248 (1970).[3] While these decisions do not purport to interpret Massachusetts labor law, surely our own General Court may be thought to have considered federal labor policy in enacting cognate Massachusetts legislation and, absent express language to the contrary, to have conformed to the federal standards. See **Datatrol, Inc. v. State Purchasing Agent**, Mass.Adv.Sh. (1980) 299 (Legislature presumptively aware of earlier related legislation); **Commonwealth v. Mercy Hosp.**, 364 Mass. 515, 520 (1974) (Legislature presumed to use terms in the sense in which they have been used before in the same context in other legislation); **Peters v. The Hartford Accident and Indemnity Co.**, Mass.Adv.Sh. (1979) 1099, 1106-1107 (Legislature presumed to be cognizant of case law definition of terms used in statutes). See also **Rival's Case**, Mass.App.Ct.Adv.Sh. (1979) 1429, 1432.

With the federal criteria in mind, then, three questions present themselves, viz.: is the present controversy one subject to collective bargaining? If so, has the bargaining process established by the General Court run its course? If not, can the court frame an injunction which preserves the bargaining process without unduly hampering the Commissioner or adversely affecting the public interest?

### a. The Duty to Bargain

The Commissioner claims that there is no duty to bargain with the Patrolmen's Association over the details of this reorganization plan. That is the position which he asserted before the first judge to hear this dispute. The Commissioner lost. Thereafter, to get out from under a preliminary injunction, he agreed to bargain and has, in fact, apparently bargained in good faith. While the manner in which the Commissioner deploys his officers to enforce the law would, at first blush, appear to be a quintessential management decision, the contract between the parties does provide that "complaints with respect to unsafe or unhealthy working conditions shall be brought immediately to the attention of an employee's superior officer and shall be the subject of grievance hereunder." Agreement between City of Boston and Boston Police Patrolmen's Association, Inc., 1979-1981 Art. XVI, § 7. Moreover, it appears undeniable that the proposed reorganization is so extensive as to actually change the working conditions of the Boston Police so as to require bargaining unless the reorganization is totally a management prerogative excluded from bargaining. Nor does the fact that this dispute arises mid-term during the running of a collective bargaining con-

---

[2] These cases are United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers v. Enterprise Wheel & Car Co., 363 U.S. 593 (1960); United Steelworkers v. American Mfg. Co., 363 U.S. 564 (1960).

[3] To insure maximum utilization of the arbitral process, the Supreme Court in United Steelworkers v. Warrior & Gulf Navigation Co. held that, when a party sought to compel arbitration in a suit under § 301 of the Labor-Management Relations Act, the court should resolve questions of interpretation of the arbitration clause by applying a strong presumption in favor of arbitrability. By making the presumption difficult to rebut the Court insured that in virtually every case in which one party sought arbitration the dispute would be settled by the arbitrator. The presumption in favor of arbitrability applies even to the interpretation of contract provisions going to the scope of arbitral authority, such as those providing for specific exclusions from the general arbitration provision." Harvard note at 637. This note argues that the presumption of arbitrability ought not apply only when it is the employer who seeks arbitration. Here, however, where it is the Patrolmen's Association which seeks further bargaining, the important point is a strong presumption favoring such resolution of disputes. . . .

tract prevent further collective bargaining. The Massachusetts Labor Relations Commission has determined, and this court agrees, that á unilateral change in working conditions during the course of a collective bargaining agreement is, unless excluded by law, the subject of a duty to bargain pursuant to G.L. c. 150E, §6.

In the present case, although the question is a close one, this court determines that, for two reasons, there exists a duty to bargain at least over the safety aspects of the proposed reorganization. First, the Commissioner has offered to bargain over this proposal and has, in fact, been bargaining in good faith with respect to it. While he now claims that this was a mere matter of grace and that he was under no duty to bargain, "statements made at any time after the making of the contract may shed light on the meaning ascribed by the parties to the language they used. See, e.g., Gishen v. Dura Corp., 362 Mass. 177, 182 (1972); Jennings v. Whitehead & Atherton Mach. Co., 138 Mass. 594, 596 (1885)." Clevenger v. Haling, Mass.Adv.Sh. (1979) 2400, 2408 (Quirico, J. dissenting). A person's actions subsequent to executing a legal document which tend to show his understanding of the document's legal effect may be considered in determining his intention at the time of execution. Rizzo v. Cunningham, 303 Mass. 16, 21 (1939). Lembo v. Waters, 1 Mass.App.Ct. 227, 233 (1973)." Bourgeois v. Hurley, Mass. Adv.Sh. (1979) 1635, 1638. In the present instance, the conduct of the parties indicates that the issue is a bargainable one.

Second, the Commissioner contends that he cannot waive statutory rights and thus, even if he made in advertent misstep in bargaining, he cannot now be held to it in view of his statutory responsibilities. While this may be the general rule, it is inapplicable in the circumstances of this case. Here, the Commissioner offered to bargain and, on the basis of that offer, succeeded in having a preliminary injunction of this court vacated and an action against him dismissed. Thus, the theory of judicial estoppel requires bargaining in the present instance.

It may be laid down as a general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. Davis v. Wakelee, 156 U.S. 680, 689 (1895)

. . . a man should not be permitted to "blow hot and cold" with reference to the same transaction, or insist, at different times, on the truth of each of two conflicting allegations, according to the promptings of his private interest. Lord Kenyon quoted in Broom, A Selection of Legal Maxims (2d.Ed. 1850) 119.

Accord Callanan Road Improvement Co. v. United States, 345 U.S. 507, 513 (1953). Scarano v. Central R.R. Co. of New Jersey, 203 F.2d 510, 512-513 (3rd Cir. 1953). 1B Moore, Federal Practice, ¶ 0.405[8]. See also Smith v. Montgomery Ward, 288 F.2d 291, (6th Cir. 1968), cert. denied 393 U.S. 871 (1969); Smith v. Boston Elevated Ry. Co., 184 F. 387, (1st Cir. 1911); Teamsters Local No. 25 v. Pennsylvania Transportation Corp., 359 F.Supp. 344 (D.Mass. 1973); Wood v. United Airlines, Inc., 216 F.Supp. 340 (E.B.N.Y. 1963). For these reasons, there existed a duty to bargain over at least the safety aspects of the proposed reorganization.

### b. The Question of Impasse

There appears little doubt that both parties agree that the present phase of their negotiations have reached an impasse. Further, it appears that "after good faith negotiations have exhausted the prospects of concluding an agreement, an employer may implement unilateral changes which are reasonably comprehended within its pre-impasse proposals". Hanson School Committee, 5 MLC 671, 675 (1979). The Patrolmen's Association, however, contends that in labor negotiations involving police and firemen, the prospects of concluding an agreement are not actually exhausted until the Joint Labor-Management Committee established by St. 1973,

c. 1078, § 4A has either declined to exercise jurisdiction or, if it exercises jurisdiction, has exhausted its efforts to resolve the dispute. The Commissioner argues that the Joint Labor-Management Committee ("the Committee") has been abolished by the passage of An Act Limiting State and Local Taxation and Expenditures (popularly known as Proposition 2½) presently scheduled to take effect on Thursday, December 4, 1980. The question of whether this act is a valid exercise of the people's will is presently under advisement in this court, see **Massachusetts Teachers Association v. Secretary of the Commonwealth,** Superior Court No. 45369 and related cases. The underlying question there taken under advisement need not be addressed here, since, even if the act limiting state and local taxation and expenditures is valid, it does not repeal by implication St. 1973, c. 1078, § 4A. While it is true that the drafters of the original initiative petition marked § 4A for repeal, a corrective draft was proposed and allowed by the Attorney General clarifying their intent to repeal binding arbitration as expressed in St. 1973, c. 1078, § 4. It is the amended version which the people adopted during the last biennial election. Thus, if the act is valid, while it may limit the scope of remedies open to the Joint Labor-Management Committee, it does not, either by its terms or by implication, repeal that section. This result accords with settled statutory construction. "[A] statute is not to be deemed to repeal or supersede a prior statute in whole or in part in absence of express words to that effect or of clear implication." **Kardas v. Board of Selectmen of Dedham,** Mass.App.Ct.Adv.Sh. (1979) 1596, 1600.

Since the committee remains in existence, police and firemen bargaining has not truly reached impasse until the committee either declines to exercise jurisdiction or, if it exercises jurisdiction, exhausts its efforts to resolve the dispute. This result follows from the express words of § 4A, which provides that, "When either party or the parties acting jointly to a municipal police and fire collective bargaining negotiations believe that an impasse exists in their negotiations, the party or both parties shall petition first the committee for the exercise of jurisdiction and for the determination of the existence of an impasse."[4]

Accordingly, since it is unclear whether actual impasse has been reached — a determination that can be made legally only by the committee — and since, if the committee takes jurisdiction, further bargaining of some sort will no doubt ensue, the Commissioner's unilateral power to impose pre-impasse proposals as to matters which are the subject of collective bargaining, is suspended until the procedures called for under St. 1973, c. 1078, § 4A have been completed.

### c. Framing the Injunction

In the circumstances in this case, crafting the injunction is most difficult. In his affidavit the Commissioner says that "any delay in the implementation of the new patrol plan will have an adverse impact on the public safety in the City of Boston." The Commissioner is an extremely experienced police professional and his opinion is entitled to a great deal of deference. It is somewhat unclear, however, why the immediate implementation of a patrol plan some ten months in the making, as to which bargaining commenced only one month ago, is presently so vital. In any event, the proper concerns of the Patrolmen's Association cannot extend so far as to frustrate the plan in its entirety and its counsel eschews any such position. The court rules that the Patrolmen's Association is entitled to an injunction preserving the status quo only as to matters which may generally affect the safety of its members pending completion of the bargaining process.

---

[4]The court expresses no opinion on the merits of the Commissioner's contention that the committee has no jurisdiction over mid-term bargaining. This is a matter which the committee itself ought address in the first instance subject to later judicial review. Harvard note at 649-652. Upon judicial review, the court can determine what weight to give to the committee's view of its jurisdiction. Levy v. Board of Registration and Discipline in Medicine, Mass. Adv. Sh. (1979) 1857, 1862-1865.

It appears that the Patrolmen's Association has no valid interest in preventing the transfer of personnel to new duty stations, **Task Force Report; The Police,** The President's Committee on Law Enforcement and Administration of Justice (1967) at 51 ("Many American police forces do not use their available field personnel effectively. The most significant weakness appears to be the failure of departments to distribute patrol officers in accordance with the actual need for their presence") (hereinafter **Task Force Report**) nor in their being deployed on one-man patrol, **Task Force Report** at 52 ("Unless there is found extraordinary personnel hazards of more than an occasional nature, uniformed personnel should be deployed singly"). While the City of Boston has in past years relied heavily on foot patrols, Police Department of Kansas City, Mo., "1966 Survey of Municipal Police Departments (Cities of 300,000 to 1,000,000, 1960 census") (Kansas City, Mo., Police Department, 1966), Co., 61, table 5, p.22, its use under present day circumstances in areas where there are a number of requests for police assistance may well involve an increase in the risk of harm to the Patrolmen's Association's members'which is more than a scintilla yet incapable of being the subject of measurement in degree. See **O'Reilly v. Paul,** Superior Court No. 44358 (slip opinion at 6, November 28, 1980)[5]

> A decision to use foot patrols should be made only after careful analysis, since it is a highly expensive form of coverage, geographically restrictive in nature, and can be wasteful of man power. Without transportation at hand, it provides extremely inflexible and rigid close patrol for specifically limited geographical areas and does not permit the ready reassignment of personnel to surrounding locations when and where police services may be specifically requested. Moreover close supervision of foot patrolmen has proven very difficult.

**Task Force Report** at 54. See Chapman, "Police Patrol Readings," (Spring, Ill.; Charles C. Thomas, 1964), pp. 105-110.

To the same extent, to require one-man patrols to respond to priority 3 calls within the area where the 139 new foot patrol routes have been designated may also adversely effect the safety of the officers involved. Authorities differ concerning the effect of single man deployment into situations of this sort. "It has been suggested that an officer making an arrest when alone is more likely to try persuasion than force. Banton, 'The Policeman in the Community' (New York; Basic Books Inc., 1964 pp. 69, 151-152.) **Task Force Report** at 190-191. "On the other hand ... if officers, particularly in areas of great hostility to the police, are nervous or afraid of being alone, this may well lead them to use a gun or nightstick where it is not needed." **Task Force Report** at 191.

At this juncture, it is enough for the court to limn these problems and the safety concerns which they implicate. As substantive matters, these safety aspects are committed to further bargaining. "[T]he court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement ..." **United Steelworkers v. Warrior & Gulf,** Nav. Co., 363 U.S. 574, 585 (1960). An injunction will therefore enter preserving the status quo as to these aspects of the working conditions of the members of the Patrolmen's Association. Such injunction will last for a finite period to avoid foot-dragging. Indeed, should a constructive process of further collective bargaining come earlier to an

---

[5]Such areas could well "dictate the assignment of two-man teams to patrol duty on foot... [if there were] too many incidents for one man to handle in a physically limited, densely populated area; a high frequency of circumstances in which officers are likely to be assaulted; and the high prospect of raucous misbehavior that can only be prevented by the concerted action of two or more officers." Task Force Report at 55.

end, the injunction will dissolve by its own terms.[6]

In short, this case presents questions not dissimilar from those presented to another Justice of this court in the first case. In that case, bargaining required by law had not begun. Here, it has not been completed. The injunction entered today is based, in part, upon a concern that the order earlier entered be fulfilled. "If [a] precedent is from a sitting judge in one's own court and represents his mature reflection, the argument in favor of following it rests not only on the appropriate amenities but on profounder considerations of equality in the treatment of litigants." Wyzanski, "A Trial Judge's Freedom and Responsibilities" from **The New Meaning of Justice** as reprinted in the **Handbook for Judges** (American Judicature Society, 1975) at 96.

## ORDER

Now, therefore, in consideration of the foregoing, pursuant to Mass.R.Civ.P. 65, the City of Boston, its Police Commissioner, and its agents, servants, and employees, and all persons acting in concert with them, are enjoined, until further order of this court, from:

(1) Deploying single officer foot-patrols along the 139 new patrol routes designated in the proposed Reorganization Plan; and

(2) Requiring any officer to respond to priority 3 (or higher) calls alone, along the 139 new patrol routes.

Nothing set forth herein shall be construed to prevent the Commissioner or his designees from implementing the proposed Reorganization Plan in all other respects. Moreover, nothing set forth herein shall be construed to prevent the Commissioner from deploying his officers singly along the 139 new patrol routes in squad cars, on horseback, or on motorcycles.

Unless modified by this court or a court of appellate jurisdiction, this order shall be dissolved in its entirety upon the first to occur of any of the following three circumstances: (a) the Joint Labor Management Committee declining to accept jurisdiction over this controversy; (b) proceedings before the Joint Labor Management Committee (including, without limitation, marathon bargaining, mediation, and arbitration, as it may order) being finally exhausted; and (c) a deadline of 5 p.m., Friday, February 1, 1981, being reached without agreement.

It is so ORDERED.
William G. Young
Justice of the Superior Court

---

[6]It must be understood that the injunction is also open to dissolution on the ground of inequitable conduct by the Patrolmen's Association. The court notes reports in the news media that officers of the Patrolmen's Association threaten disobedience of the law should the issue here presented go against them. So far as can be determined, these reports are more extreme than the actual statements. Apparently, the most that can be said is that an officer of the Patrolmen's Association has stated that the conduct of municipal officers is the type which would tend to lead union members to work slow downs or stoppages. This is not even a threat to violate the law and it is clearly protected free speech.

Nevertheless, it should go without saying that this court is not to be bullied or threatened. Without in any way chilling the rights of free speech and association enjoyed by the members of the union, it is appropriate to state that if an officer of the Patrolmen's Association declares a present intention to violate the law governing the union activities of police officers, such action would be so inequitable, coming from one who has sought the recourse which the law provides, that it would warrant vacating the injunction.